**The People of the State of Illinois, Plaintiff-Appellee,
v. Frank Barbic, Defendant-Appellant.**

Gen. No. 68–63.

Second Judicial District.

February 5, 1969.

Kevin Kelly, of LaSalle, for appellant.

John L. Moore, State's Attorney, of Oregon, for appellee.

MR. JUSTICE DAVIS delivered the opinion of the court.

The defendant, Frank Barbic, was found guilty of driving 62 miles per hour in a posted speed zone of 50 miles per hour, in violation of section 49 of the Uniform Act Regulating Traffic on Highways (Ill Rev Stats 1967, c 95½, par 146), and was assessed a fine of $12, plus costs of the suit. The trial was before the magistrate, without a jury. Upon appeal, the defendant prays for reversal of the judgment, or that the cause be remanded for new trial.

The defendant based his defense on a chart or graph made by a Tachograph machine or device, with which his tractor unit was equipped. The Tachograph recorded chronologically the speed and miles per hour, at any given time—in direct relationship to the time of day—together with other data, independently of any act of the defendant, other than the operation of the tractor.

The theory of the defendant is that the State did not prove him guilty beyond a reasonable doubt; that the radar unit which registered the speed of the tractor was subject to error inherent in its structure and operation, and to error of judgment of its operator; and that the Tachograph chart was not contradicted.

The People's theory is that the radar equipment used by the arresting officer was proven to have been tested both before and after the offense; that it was working

accurately; that the court had the right to take judicial notice of the accuracy of the radar equipment as used to determine the speed of moving vehicles; that the court, as the trier of fact, had the right to determine, from all of the evidence, the facts with reference to the offense charged and the validity of the defense thereto; and that the defendant's guilt was established beyond a reasonable doubt.

The People called four witnesses: Corporal Fred Fromm, who has been on the Illinois State Police Force for 17 years, and had operated radar devices for about 10 or 11 years; Corporal Fred Spilman, who had served 10 years and had worked with radar over the entire period; Trooper Jay O. Buckley, who struck the tuning fork on a block of wood while standing directly in front of the control head of the radar device; and Elmer Eyman, Technical Supervisor of the State Radio Bureau, who prepared applications for radar equipment to be purchased, and set up all radar testing procedures.

The following is a fair narrative statement of the testimony of the State Police Officers: Fromm had received complete instructions in radar when it was first used in his State Police District, and further instructions when any change or improvement was made in the equipment. He was operating the device at the time and place in question. The tripod with the radar control was located along the paved portion of the highway, with a cable running to his squad car, which was 70 to 80 feet from the road, and the radar machine and the recording graph were in the front seat of his car. The radar device was set up, warmed up for 10 to 20 minutes, and was then tested and found to be accurate at 8:30; 9:18; 9:45 and 11:30 a. m., and at 12:15 p. m. All tests were made with a tuning fork, set for a speed of 65 m. p. h., and the radar device tested out perfectly at all times on the day in question. Fromm knew of no weak points or possibilities of error in the device. The possible percent-

age of error in the radar testing was less than one percent.

A Schwerman tractor and trailer (herein called Truck No. 1) of grayish color, traveling southerly, passed through the radar wave or beam at 9:00 a. m., when no other vehicles were within such beam. It was traveling 62 m. p. h. when picked up by the radar beam and its speed dropped to 58 m. p. h. as it went out of the beam. Two other Schwerman trucks were following Truck No. 1 and the nearest was 20 to 30 seconds behind it. Corporal Fromm radioed Corporal Spilman that Truck No. 1 registered 62 m. p. h. on the radar. Corporal Spilman, who was operating a catch-car, stopped Truck No. 1 and issued an arrest ticket to the defendant—its driver— for speeding as indicated on the radar graph. Corporal Spilman was within the view of Corporal Fromm at all times after the radio call and when the arrest was made. Spilman then radioed back to Fromm that he had stopped Truck No. 1, informed the defendant of the violation, and had issued a ticket to him.

The radar graph for the date in question, was admitted in evidence. It reflected the speed of the various vehicles which passed through the radar beam, with legends in the hand of Corporal Fromm, indicating the graph marking pertaining to Truck No. 1 which came through the radar beam at 9:00 a. m. It also reflected the tests made at 8:30 and 9:18 a. m.

At the time of the arrest, the defendant stated that he did not believe he was traveling 62 m. p. h., and that a Tachograph on Truck No. 1 did not indicate that speed.

Corporal Spilman recalled seeing the two trucks which were following Truck No. 1, and he had enough time to pull onto the road between the time when Truck No. 1 went out of the radar beam and the first following truck reached the beam, which indicates that there was

no traffic proceeding northerly on the highway at the time.

Elmer Eyman testified relative to proper testing procedures, and those he outlined conformed to those used on the date in question. He stated that the tuning fork test, after a five-minute warm-up of the radar device, had a possibility of error of less than one percent. He completely described the operation of the radar unit and explained the phenomenon of the measurement of speed by radar. Included in his explanation was a statement that when a larger vehicle (a truck) goes through the radar beam, it returns more energy to the radar machine and the recording of the speed of such vehicle will be in the nature of a plateau on the radar graph; while a smaller vehicle (a car) will return less energy and will register a peak on the graph.

The radar graph reflected plateaus for the trucks and peaks for the cars, and it did not indicate that any cars were traveling north or south immediately before or after, or at the time when the trucks crossed the radar beam.

The defendant testified that he had worked for Schwerman Trucking Company for seven years, and that all of the trucks that he had driven were equipped with Tachographs—which registered the work time of the various drivers, the miles traveled, and the stops made. He stated that the standard procedure was to open the tractor doors and attach the Tachograph machine on the dash to the right of the steering wheel, insert an unused chart in the Tachograph, then lock the Tachograph machine and use the Tachograph key as the ignition key for the truck.

The chart, according to the defendant's testimony, showed the time that the truck started—according to the visible clock contained in the Tachograph—the miles traveled by the truck and the speed. Before inserting the chart in the Tachograph, the defendant would write the

date, his name, the unit numbers of the truck, and its present mileage on the face of the chart.

He testified that when he was stopped by Corporal Spilman, he was driving 50 m. p. h. as reflected by the speedometer which is a part of the Tachograph machine; that the chart from the Tachograph which was on the truck on October 5, 1967, reflected that at 9:00 a. m., on that date, the truck was traveling at a speed of 50 m. p. h.; that the rules of Schwerman Trucking Company limit the speed which trucks shall be driven to 50 m. p. h.

The defendant stated that he did not have the Tachograph checked for accuracy either before or after the arrest; and that he had nothing to do with the Tachograph other than to use it as directed by the company.

Robert Galasse, a graduate engineer and an experienced application engineer at Sangamo Electric Company, of Springfield, testified that he assisted the sales organization of Sangamo in the technical orientation of the Tachograph; and that he prepared service manuals, installation instructions and worked with the engineering department on design problems.

He stated that the Tachograph is a precision recording speedometer which employs the use of a mechanical clock that drives a pressure sensitive chart; that as the clock drives the chart, it is marked on by three styluses, which cut the plastic off the chart; that stylus number one records the speed of the vehicle; stylus two, the total miles traveled; and stylus three, whether the vehicle is stopped or moving and whether it is stopped with the engine running or turned off. He stated that all of these recordings are made in the correct correlation of the exact time—either day or night—so that a complete graphic record is made of the operation of the vehicle during any given period of time.

He further stated that the speedometer cable activates the Tachograph, which is operated on the same principle

as a speedometer on a passenger car; that there are 1,000 turns of the speedometer cable per mile; and that there is a geared connection from the end of the speedometer cable to the Tachograph, which may come off the transmission or the front wheel; that the installation on Truck No. 1 came off the front wheel; and that if the front tires on the truck were worn, the mileage could vary two or three percent.

He had not seen Truck No. 1 and had not inspected the Tachograph which was on it; that after being given the total mileage figures for the defendant's trip for the day, as furnished by the defendant or his employer, it was his opinion that the Tachograph chart was accurate; and that the Tachograph had not been tampered with.

John Hubinsky, Western Division Vice-President of Schwerman Trucking Company, testified that he had examined the Tachograph chart taken from Truck No. 1, dated October 5, 1967; had recalculated the mileage from the Household Goods Carrier's Guide and rechecked the mileage as indicated on the chart; had taken a set period in which the truck was moving 50 m. p. h., and worked out the calculations as to the miles traveled in that distance; that the speed recorded on the Tachograph chart was accurate; and that the chart had not been tampered with.

John W. Greuer, the terminal manager of the Oglesby Terminal, testified that the tread on the front tires of the truck in question, was equal to about 90% of the tread of a new tire; and that he tested the Tachograph after the defendant drove back to the terminal and it then recorded accurately. However, his explanation with reference to the procedure used in the testing and its efficacity, left much to be desired.

Sam Wallendal, an engineer for Carriers Insurance Company, testified on behalf of the defendant that the radar is subject to occasional error; that a radar beam will pick up the fastest moving vehicle first; that

it will pick up the nearest vehicle first; that if two vehicles were of equal distance from the control head of the radar, it would pick up the larger vehicle first; and that if two or more vehicles approach the radar beam at the same time, either parallel or in close proximity, the radar would pick up the fastest unit first.

■ In People v. Abdallah, 82 Ill App2d 312, 315, 316, 226 NE2d 408 (1967) the court discussed the term "radar," and at page 315 stated:

> "The 'radar' device presently in common use by law enforcement agencies for the determination of speeds of moving vehicles, . . . operates on the Doppler principle, that is, the emission of a continuous electromagnetic wave which enables the speed of a target object to be determined by measuring the difference in frequency between the wave emitted from the radar device and the wave reflected from the object. Kooper, The Scientific Reliability of Radar Speedometers, 33 NCL Rev 343. It is presently so well settled that the Doppler principle is an accurate means of determining the speed of a moving object that a court may take judicial notice thereof; and expert testimony is unnecessary to establish the usefulness of the method. City of Cleveland v. Ferell, 168 Ohio St 298, 154 NE2d 630; State v. Dantonio, 18 NJ 570, 115 A2d 35; People v. Magri, 3 NY2d 562, 147 NE2d 728, 730; see also 49 ALR2d 469 and 61 CJS, Motor Vehicles, Sections 647, 648."

This court also takes judicial notice of the accuracy of such radar devices generally in determining the speed of a moving object, subject to the necessary proof as to the accuracy and proper operation of the particular device under consideration.

In the case at bar, the judgment of the trial court did not necessarily rest on such judicial notice. The evidence on behalf of the People established that there were no

possibilities of error in the particular radar device employed at the time in question. Also, it was conclusively proven that the device was tested both before and after the 9:00 a. m. arrest of the defendant; that the tests were accurate; and that the percentage of error in testing, was less than one percent.

It is true, as the testimony for the defendant indicated, that the officers operating the device may make mistakes in the description or observation of the vehicles passing through the radar beam, or there may be interference within the area of the beam. Also, direction, time and distance cannot be measured by the device. However, the testimony on behalf of the People was positive with reference to the description of Truck No. 1 and the absence of interfering traffic. There was no conflict in the evidence relative to the direction in which the truck was traveling.

In People v. Abdallah, supra, at page 316, the court stated:

> "Where the accuracy of a particular radar device is unproven, the results thereof will be insufficient to convict for a traffic violation, although such results are admissible as evidence. People v. Magri, 3 NY2d 562, 147 NE2d 728. Where, on the other hand, there is reasonable and sufficient proof of the accuracy of the radar instrument, the reading taken therefrom may of itself be sufficient for a conviction. People v. Dusing, 5 NY2d 126, 155 NE2d 393.

> "Defendant maintains that the tuning fork used to test the accuracy of the radar device was itself untested for accuracy and that therefore the operator was not qualified to testify to the accuracy of the device. We disagree. The officer testified that he made several tests with the tuning fork prior and subsequent to the time defendant passed into the

radar field, and that the meter on each occasion showed a reading of 65 miles per hour."

And, at page 317, the court stated:

"The operator of a radar instrument does not have to be an expert in the science or theory underlying the functions of the instrument. It is sufficient that he is familiar with the device and its operation, the evidence of which presents a question of weight and credibility for the jury. People v. Johnson, 23 Misc2d 11, 196 NYS2d 227."

■ We are of the opinion that there was sufficient proof of the accuracy of the particular radar unit in question, for the trier of fact to find the defendant guilty of speeding based solely upon the reading taken from the radar unit. However, we must also consider the defense based on the reading of the Tachograph chart with reference to speed.

In support of this defense, the defendant established that the Tachograph is a precision recording speedometer employing the use of a mechanical clock to drive a pressure sensitive chart, thereby providing an autographic record of the vehicle's operation. The chart from the Tachograph indicated that at 9:00 a. m., the defendant was driving at a speed of 50 m. p. h., and the chart had not been tampered with.

Robert Galasse and John Hubinsky both testified as to the accuracy of the Tachograph chart. However, Galasse had not seen Truck No. 1, and had not inspected the Tachograph which was on it at the time of the defendant's arrest. Hubinsky based his opinion as to the accuracy of the Tachograph chart by recalculating mileage from the Household Goods Carrier's Guide, by rechecking the mileage indicated on the chart, and by checking the mileage as indicated on the chart when the truck was moving at 50 m. p. h. With this information, he

worked out the calculation of the number of miles traveled in this distance and concluded that the chart was accurate.

Galasse also stated that if the front tires were worn, the mileage could vary two or three percent; and John Greuer, terminal manager, stated that the front tires on Truck No. 1 had 90% of the tread of a new tire.

The trial court was the trier of the fact issue in this case and determined the credibility of the witnesses. He saw the witnesses, heard them testify and had the opportunity of determining their credibility, not only from their testimony, but also from their general demeanor on the witness stand, the inflection of their voices and from other emotional and physical reactions to questions propounded, to an extent not available to this court from an examination of the cold written record. It was his prerogative to believe or disbelieve the witnesses and to weigh their testimony.

██ Reviewing courts in Illinois will not reverse a judgment of conviction on the ground that the evidence failed to sustain the judgment unless there is a reasonable and well-founded doubt as to the guilt of the accused and the judgment is palpably contrary to the weight of the evidence. People v. Lobb, 17 Ill2d 287, 294, 161 NE2d 325 (1959); People v. Prohaska, 8 Ill2d 579, 589, 590, 134 NE2d 799 (1956); People v. Stangeland, 76 Ill App2d 77, 80, 220 NE2d 748 (1966); People v. Booher, 73 Ill App2d 226, 229, 330, 218 NE2d 779 (1966). Such doubt does not exist in the case at bar.

██ ██ In this case, the substantial testimony was that both the radar device and Tachograph were accurate, although a possibility of error at the time of the arrest existed in connection with each device. The case was heard before the court without a jury. In such cases, it is the function of the trial court to determine the credibility of the witnesses and the weight to be afforded their testimony, and where the evidence is merely con-

flicting, a reviewing court will not substitute its judgment for that of the trier of fact. People v. Clark, 30 Ill2d 216, 219, 195 NE2d 631 (1964). Consequently, the judgment of the trial court is affirmed.

Judgment affirmed.

ABRAHAMSON, P. J. and MORAN, J., concur.