JORGENSON, Judge.
Phillip Gargone appeals his convictions and sentences for manslaughter by operating a motor vehicle while intoxicated and manslaughter by culpable negligence. He claims that the numerous errors committed at his trial rendered the proceedings fundamentally unfair and, therefore, entitle him to a new trial. We agree and, for the reasons which follow, reverse the convictions and remand for a new trial.
The first error presented by Gargone, the improper admission into evidence of the results of his blood-alcohol test, compels our reversal. We consequently do not address the remaining errors which occurred in this trial.[1]
Gargone’s prosecution arose from a series of events which occurred on November 4, 1983. Gargone, a taxicab driver assigned to the Veterans Administration Hospital, completed his morning duties and adjourned to the El Toro Lounge where he consumed two or three vodkas and water. He left the lounge at about 1:00 p.m. and proceeded north on Biscayne Boulevard. *422 At Northeast 137th Street, his taxi erratically left its course, crossed the two southbound lanes of traffic, entered an open field, and collided with a flower stand, killing its two vendors, Dorothy and Hyman Milman.
Three fire rescue attendants and one civilian witness were the first to respond to the accident scene. The attendants advised Gargone that in order to administer medical aid they had to ascertain whether he had consumed alcohol. He informed the attendants that he had consumed two or three alcoholic drinks about one hour before the accident. Gargone claimed he had blacked out. His last recollection was of travelling northbound on Biscayne Boulevard in the area of Northeast 127th Street.
Gargone was transported to North Miami General Hospital. Dr. Sanet, the emergency room physician, ran a brief electrocardiogram which revealed a defect in the heart's conduction system. Although Dr. Sanet recommended that Gargone be hospitalized and placed on a heart monitor, Gar-gone declined such treatment.
Three North Miami Beach police officers —Lack, Schneider, and Bosworth — saw Gargone at the hospital. Detective Schneider informed him that a traffic homicide investigation was underway and then read him his Miranda rights. Gargone initially rejected Detective Schneider’s request to submit to a blood test. After being advised of the law pertaining to blood tests in cases of death or serious bodily injury,[2] he agreed to the blood test. Approximately ninety minutes after the accident, Dr. Sanet, pursuant to Detective Schneider’s request, withdrew the blood sample. The blood sample was tested by an employee of the Medical Examiner’s office licensed by HRS to perform blood-alcohol testing. The test indicated a .14 blood-alcohol concentration.
A four-count information was filed, charging Gargone with DWI manslaughter and manslaughter by culpable negligence. A plea of not guilty was entered, and a jury trial was held. There was considerable controversy at trial as to whether Gar-gone exhibited signs of intoxication at the accident scene and the hospital. The fire rescue attendants agreed that he initially appeared belligerent or combative in resisting medical treatment. The attendants were not in agreement as to whether Gar-gone had an odor of alcohol and bloodshot eyes. Dr. Sanet and the two emergency room nurses testified that they did not observe any signs of intoxication.
Upon denial of Gargone’s pretrial motion to exclude the blood-alcohol test results and, over his renewed objection at trial, the blood test results were introduced into evidence. Dr. Leonard Bednarczyk, a toxicologist with the Dade County Medical Examiner’s office, testified that an average male weighing 270 pounds (the approximate weight of Gargone) would have to consume seven to thirteen ounces of alcohol in order to reach a .14 blood-alcohol level. He further testified that, because the sample was taken ninety minutes after the accident, Gargone’s blood-alcohol level at the time of the accident could not be retrospectively determined. Dr. Bednarczyk also testified that the absorption process ranged from fifteen minutes to three hours and varied *423 according to the individual’s metabolism. He stated that, if the .14 test result were accurate, symptoms of intoxication should have been readily apparent to the nurses and doctor present when the sample was taken.
Dr. Robert Zurawlecki, a physician appointed by the court to examine Gargone, testified that Gargone suffered from sick sinus syndrome, a heart disease which causes sudden episodes of accelerations and decreases in the heartbeat and which can cause unconsciousness without any pri- or warning. Dr. Sanet, the emergency room physician, acknowledged that sick sinus syndrome could explain Gargone’s claim of a blackout although, without more data, Dr. Sanet stated that he could not make an accurate diagnosis. The jury returned verdicts of guilty as charged on all four counts, and Gargone was adjudicated guilty in accordance with the verdicts.
The admission into evidence of the results of Gargone’s blood-alcohol test was improper since the test was not conducted in conformity with the rules governing the collection of blood specimens for blood-alcohol testing. This error was of paramount importance since the blood-alcohol test results were an essential component of the state’s case against Gargone. The trial court erred in denying Gargone’s pretrial motion to suppress the test results and in subsequently denying Gargone’s objection at trial to the admissibility of the test results.
One of the primary rationales for the regulations mandating the use of approved techniques in blood-alcohol testing is to guarantee “reliable scientific evidence for use in future court proceedings.” State v. Bender, 382 So.2d 697, 699 (Fla.1980). The rules for blood-alcohol testing promulgated by HRS were adopted pursuant to sections 316.1932-.1934, Florida Statutes (1983).[3] These procedures are set forth in Florida Administrative Code Rule 10D-42.29 which provides:
10D-42.29 Blood Specimens—Labeling, Collecting, Storage.
(1) All blood specimens vials or vacu-tainer tubes shall be labeled and shall contain the following information:
(a) Name of person tested;
(b) Date and time specimen collected; and
(c) Initials of personnel collecting the specimen.
(2) Cleansing of the person’s skin in collecting of the blood specimen shall be performed with a non-alcoholic antiseptic solution.
(3) Blood specimens shall be collected in a vial or vacutainer tube containing an anticoagulant substance. Said vial or vacutainer shall be stoppered and sealed or capped and sealed to prevent loss by evaporation.
There was virtually no adherence to these rules in the instant case since only the labelling criteria of Rule 10D-42.29(1) was met.
Without substantial compliance with the administrative regulations, the test results were clearly inadmissible since “test results are admissible into evidence only upon compliance with the statutory provisions and the administrative rules enacted by its authority.” Bender, 382 So.2d at 699. See Dorman v. State, 492 So.2d 1160 (Fla. 1st DCA 1986) (blood-alcohol test results not admissible for lack of substantial compliance with statutory requirements where trooper’s observation that defendant’s eyes were red insufficient to establish probable cause to take sample); State v. *424 Roose, 450 So.2d 861, 862 (Fla. 3d DCA) (test results inadmissible where person who withdrew defendant’s blood not statutorily authorized to do so; lack of authorization “fatally infects the reliability of the test results and renders them inadmissible into evidence”), rev. denied, 451 So.2d 850 (Fla.1984); Beasley v. Mitel of Del., 449 So.2d 365 (Fla. 1st DCA 1984) (error to admit evidence of blood-alcohol test results where blood not drawn or tested in accordance with HRS regulations); Grala v. State, 414 So.2d 621 (Fla. 3d DCA 1982) (blood-alcohol test results improperly admitted into evidence where state failed to present evidence of identity or qualifications of person who withdrew defendant’s blood).
The state counters the improper admission of Gargone’s blood-alcohol test results by attempting to minimize their significance in the state’s case. The state contends that any error accruing from the admission of the test results was harmless in light of the “overwhelming evidence” of Gargone’s intoxication. The trial testimony pertaining to the issue of Gargone’s intoxication was extremely equivocal and could not, by any measure, be characterized as “overwhelming.” When considered in concert with Dr. Zurawlecki’s expert medical testimony regarding the likelihood that Gargone suffered a blackout precipitated by sick sinus syndrome and Dr. San-et’s testimony that Gargone’s electrocardiogram indicated a heart blockage, the “overwhelming” evidence argument made by the state becomes even less persuasive.
The cases relied upon by the state for the proposition that an improperly admitted blood-alcohol test does not necessarily taint the integrity of the resulting conviction are distinguishable. In Grala, this court affirmed the defendant’s DWI manslaughter and vehicular homicide convictions despite the improper admission of the blood-alcohol test results where the testimony of all of the witnesses on the accident scene conclusively established that the defendant had been very intoxicated. In State v. Macias, 481 So.2d 979 (Fla. 4th DCA 1986), the court found overwhelming evidence of guilt aside from the defendant’s failure of roadside sobriety tests where the defendant could not stand without swaying, had slurred speech, and had a breathalyzer reading of .19 percent. In contrast, the investigating officers in this case testified that Gargone was able to walk steadily. The medical personnel who treated Gar-gone testified that no signs of intoxication were apparent. In short, the evidence of intoxication here was far less substantial than in Grala or Macias. See Turk v. State, 403 So.2d 1077 (Fla. 1st DCA 1981) (DWI conviction overturned where only evidence of defendant's blood-alcohol level was the result of the intoximeter test, and the intoximeter had not been properly documented).
The state has not succeeded in demonstrating that the error of admitting the blood-alcohol test results into evidence was harmless. As the beneficiary of this error, it is the state’s burden to prove beyond a reasonable doubt that the error did not contribute to the verdict. State v. DiGuilio, 491 So.2d 1129 (Fla.1986). The .14 blood-alcohol reading was constantly emphasized by the prosecutor throughout Gargone’s trial. The prejudicial impact of the test results was exacerbated by the prosecutor’s repeated exhortations to the jury that the test results were a “chemical fact” and were, therefore, “scientifically reliable.” The record is replete with the prosecutor’s references to the validity of the test results as well as her characterization of the test results as “scientific” and “real hard” proof of Gargone’s intoxication. While the state is correct in positing that the testimony of the various witnesses who shared the belief that Gargone was intoxicated was sufficient to create a factual issue for jury determination, it does not automatically follow that the guilty verdicts returned by the jury were not the product of the improper admission of the blood-alcohol test results. Considering the record in its entirety, especially the exculpatory medical testimony, we are convinced that the error of admitting the test results into evidence seriously impaired Gargone’s *425 right to a fair trial. We, therefore, reverse his convictions and remand for a new trial.
Reversed and remanded for a new trial.

. Of the nine errors complained of, at least five concern prosecutorial misconduct. (We were advised at oral argument that the prosecutor involved is no longer with the state attorney’s office.) The remaining errors had to do with sentencing guidelines.

. Detective Schneider specifically apprised Gargone of section 316.1933(1), Florida Statutes (1983):
316.1933 Blood test for Impairment or intoxication In cases of death or serious bodily injury; right to use reasonable force.—
(1) Notwithstanding any recognized ability to refuse to submit to the tests provided in s. 316.1932 or any recognized power to revoke the implied consent to such tests, if a law enforcement officer has probable cause to believe that a motor vehicle driven by or in the actual physical control of a person under the influence of alcoholic beverages or controlled substances has caused the death or serious bodily injury of a human being, such person shall submit, upon the request of a law enforcement officer, to a test of his blood for the purpose of determining the alcoholic content thereof or the presence of controlled substances therein. The law enforcement officer may use reasonable force if necessary to require such person to submit to the administration of the blood test. The blood test shall be performed in a reasonable manner. “Serious bodily injury” means a physical condition which creates a substantial risk of death; serious, personal disfigurement; or protracted loss or impairment of the function of any bodily member or organ.

. Section 316.1932(l)(f)(l), Florida Statutes (1983), provides:
316.1932 Tests for Impairment or intoxication; implied consent; right to refuse.—

******

(f)l. The tests determining the weight of alcohol in the defendant's blood shall be administered at the direction of the arresting officer substantially in accordance with rules and regulations which shall have been adopted by the Department of Health and Rehabilitative Services. Such rules and regulations shall be adopted after public hearing, shall specify precisely the test or tests which are approved by the Department of Health and Rehabilitative Services for reliability of result and facility of administration, and shall provide an approved method of administration which shall be followed in all such tests given under this section.