## STATE OF FLORIDA v BENNETT (Consolidated)

### Case No. 84072/3-QH, etc.

*County Court, Volusia County*
*September 7, 1988*

**APPEARANCES OF COUNSEL**

**Sam Easterbrook,** Assistant State Attorney, for plaintiff.
**Flem K. Whited, III** for defendants.

**59**

## OPINION OF THE COURT

SHAWN L. BRIESE, County Judge.

THIS CAUSE came before the Court on June 16, 1988 for an evidentiary hearing on Defendants' Motions in Limine. This Court, based on evidence, argument, and extensive research, finds as follows:

The defense, pursuant to its motions in limine, seeks to prohibit breath test technicians from referring to any result of a breath test as a quantity of ethyl alcohol by weight, i.e., defendants seek to limit testimony to results based on attenuation of light at specified micron bands. The basis for the motions are that the involved infrared breath test machines are not specific for ethyl alcohol and the assumed blood-breath partition ratio of 2100:1 may not be the defendants' actual ratio. The three machines involved in the instant cases are the Intoximeter 3000, Intoxilyzer 5000 and the Intoxilyzer 4011AS.

The state and the defense each called two expert witnesses at the June 16, 1988 evidentiary hearing. The defense initially called Richard E. Jensen, Ph.D., a toxicologist and analytical chemist with an expertise in breath testing. Dr. Jensen explained the theory behind the three relevant infrared breath testing instruments (see transcript excerpt, hereafter "T" 3-4). Each relevant machine has an acetone screen (T 6, 7, 10). The Intoxilyzer 5000 uses a micron band to determine water vapor interference (T 7). There are, according to Dr. Jensen, approximately eleven specific areas that can be identified for the absorption of infrared radiation by the ethyl alcohol molecule (T 5).

Dr. Jensen testified that the instruments are not specific for ethyl alcohol except as a major component (T 5, 11, 12). A number of volatile organic compounds absorb radiation at the micron bands used by the instruments (T 5). The instruments convert the breath alcohol level to a blood alcohol level at a ratio of 2100:1 (T 4-5, 12-13).

Dr. Jensen, on cross examination, while able to list a number of toxic interferants (including acetone), was unable to specify the required concentrations to be measured on infrared instruments (T 14, 16). Dr. Jensen testified, "So, a very, very small concentration, in comparison, when dealing with the concentration of ethyl alcohol, *may* give you a very pronounced absorption effect" [Emphasis added] (T 15).

Cross examination showed that the Intoxilyzer 5000 was recommended by Dr. Jensen in Minnesota for evidential breath testing (T 17). He found there was a fairly close relationship in the blood-breath correlation tests (T 18). The partition ratios, in the majority of the

tests, were lower, i.e., the breath result was lower than the blood result (T 18, 19).

Michael P. Hlastala, Ph.D., a respiratory physiologist with an expertise in breath testing, described lung physiology as it relates to breath alcohol (T 21-27). Dr. Hlastala testified that there is no scientific basis for the partition ratio of 2100:1. The ratio is based on empirical analysis (T 29, 51-52). Every state uses the 2100:1 ratio (T 51).

Dr. Hlastala identified the following three factors as effecting a person's partition ratio; (1) body temperature, (2) hematocrit (blood red cell concentration), and (3) breathing patterns (T 31-32). The breathing pattern could have the greatest effect on the partition ratio (T 32).

The 2100 value is an average value (T 32-33). If a person with an actual partition ratio of 2100:1 (also the machine calculated ratio) has a breath alcohol reading of .10, a person with a 1500:1 partition ratio would have a breath alcohol reading 40% (.04) higher while a person with a 3500:1 ratio would have a breath alcohol reading 40% lower (T 34).

Elevating temperature decreases the ability to hold alcohol in the blood (T 35). The average body temperature is 98.6°F (37°C). Each person's body temperature varies during the day by approximately one degree centigrade (normal diurnal variation) (T 35). Elevating body temperature by one degree will increase breath alcohol content by 6.5% while lowering by one degree decreases breath alcohol content by 6.5% (T 36).

Hematocrit (blood red cell concentration) also affects the partition ratio. The average hematocrit is approximately .45 (T 37). The normal range is between .37 to .52 (T 37-38). A person with a hematocrit of .52 would have a 6% higher breath alcohol content than blood alcohol content. A person with a hematocrit of .37 would have a 6% lower breath alcohol content than blood alcohol content (T 39).

Breathing patterns affect the amount of alcohol in a breath sample (T 43, 44). Hyperventilating produces lower breath readings by approximately 11% (T 43, 44, 45). Breath holding produces a higher breath alcohol reading by approximately 16% (T 44, 45, 46).

Dr. Hlastala, on cross examination, admitted that in the vast majority of cases involving blood-breath correlations, the partition ratio is 2100:1 or higher (T 52-53). All of the variables could admittedly produce an additive error (T 53-54). Dr. Hlastala agreed with a study

**61**

showing 86 to 90% of the population had a partition ratio higher than 2100:1 (meaning 10 to 14% had lower ratio producing a higher breath alcohol result than actual blood) (T 56-57).

Howard R. Rarick, D.P.H., the Scientific Director for Florida's Implied Consent Program, was the state's first witness. Dr. Rarick was also declared to be an expert in alcohol breath testing. Blood-breath correlations personally conducted by Dr. Rarick on the Intoximeter 3000 B1 involved 137 data points from 30 people (T 65). Ninety six percent of breath test results were equal to or lower than the blood results. (T 65-66). No data point was higher than .016. (T 66-67). Dr. Rarick, indirectly, based on the results, did not find any hydrocarbon interferants in sufficient quantities to make the breath test artificially high (T 67).

Partition ratios were also calculated on the thirty people (T 68). Ninety six percent were 2100:1 or higher making the breath test result lower than the blood (T 68-69). Dr. Rarick testified that the 2100:1 ratio is a "readily acceptable figure [in the American scientific community] for evidentiary purposes when the legal test is beyond a reasonable doubt" (T 69). It has been accepted in 50 states for 15 years (T 80).

Dr. Rarick testified that breath test operators, based on training, would not take a breath sample from someone who is hyperventilating or holding his/her breath (T 72-73). Breath tests also would not be conducted on persons who evidence a high temperature (T 74). Dr. Rarick did admit that a one to four degree temperature change likely would not be detected (T 74, 84). Dr. Rarick did not specifically address hematocrit levels but indicated that blood-breath correlations do not show the described additive error (T 74-75).

Robert Borkenstein, who holds a doctorate, is a Professor Emeritus at Indiana University and who has been involved in breath testing since its inception, and a court declared expert in evidentiary breath testing, was the last witness to testify. Dr. Borkenstein found, in testing all of the instruments developed to date (except the Intoxilyzer 5000 which he has not had the occasion to test) that external interfering materials are so low as to produce at most only a readable result. No significant error is produced (T 87-88, 107). He found that industrial heavy alcohol vapors could produce as much as a .015 error (T 88, 107). Acetone was described as the only internal hyrocarbon that could produce error in a breath test result (T 88).

Dr. Borkenstein has been debating the partition ratio issue since its beginning (T 95). Dr. Borkenstein agreed with the 1954 National

62

Safety Committee and a 1972 multidisciplinary learning group that the 2100:1 ratio is warranted in clinical and legal applications (T 98). Dr. Borkenstein, with regard to blood-breath correlations, using all instruments including infrared instruments, testified that the predominant number of breath readings were lower than corresponding blood results (T 114).

It would appear that the defense is making the foundational scientific reliability argument from a specific testimonial angle. Defendants rely principally the Nebraska cases of *State v Hvistendahl,* 405 N.W.2d 273 (Neb. 1987), *State v Burling,* 400 N.W.2d 872 (Neb. 1987), and *State v Bjornsen,* 271 N.W.2d 839 (Neb. 1978) along with *State v McClain,* 525 So.2d 420 (Fla. 1988).

It would appear that blood alcohol levels as determined by breath test instruments are admissible in evidence (as reliable scientific evidence) in every state in the country, despite differing opinions as to their reliability. Florida, as in most states, has mandated by statute (§§ 316.1932, 316.1933, and 316.1934 *Fla. Stat.)* that an agency or department of state (Department of Health and Rehabilitative Services) approve techniques and methods for conducting chemical analysis of a person's breath or blood. See *State v Bender,* 382 So.2d 697 (Fla. 1980).

The overall purpose is to address the problem of drunk drivers and to assist in implementing section 316.193 *Fla. Stat* (Driving Under the Influence). The purpose of those portions of the above cited sections which direct law enforcement to use only approved techniques and methods is to ensure reliable scientific evidence for use in future court proceedings and to protect the health of those persons being tested. *State v Bender, supra.* See also *Gargone v State,* 503 So.2d 421 (Fla. 3d DCA 1987).

*Bender* held that when the prosecution presents evidence of alcohol influence complying with statutory provisions and administrative rules which includes an approved alcohol test method by a licensed operator the fact finder may presume that the test procedure is reliable and the operator qualified. See also *People v Donaldson,* 319 N.Y.S.2d 172 (App. Div 1971). The court went on to note that the defendant may attack the reliability of the testing procedures and the qualifications of the operator. Other evidence showing a lack of impairment of normal faculties can also be presented.

The Court in *People v Capporelli,* 502 N.E.2d 11 (Ill. App. Ct. 1986) dealt with the breath test accuracy issue. Capporelli, who had been arrested for driving under the influence of alcohol, was tested on

63

an Intoxilyzer 4011; the result was a .11 alcohol content. Defendant claimed that his due process rights were violated because the court failed to acknowledge the partition ratio variable. The defense expert testified to a 14% chance of error due to the range of possible ratios while the state expert testified to a 10% chance of error.

The court in noting that Illinois has a statutory scheme providing for approving methods or techniques revealed that the test for judicial review of such legislation is whether a rational basis supports it. Where the existence of scientific evidence supports such legislation, even though disputed by other studies, a rational basis has been established and the legislation should be upheld. The court in noting that it is well settled that courts may take judicial notice of results of chemical tests used to determine intoxication even absent unanimity as to the accuracy of those tests cited among other cases *People v Barbic,* 244 N.E.2d 626 (Ill. App. Ct. 1969) (Court allowed to take judicial notice of accuracy of radar detector even though possibility of error existed). The court, given the substantial support for acceptance of the scientific principles and the methods approved of by the legislature on measuring blood alcohol concentration found a rational basis for the legislation. The court noted that objections as to accuracy go to the weight of the evidence not its admissibility.

The Court in *State v Lowther,* 740 P.2d 1017 (Hawaii App. Ct. 1987) is in accord with the rationale in *Capporelli.* The court held that a defendant can challenge the general reliability of breath testing devices. Admissibility of breath test results does not automatically equate with the sufficiency of the evidence to establish an unadmitted material fact. It is for the fact finder and not the legislature to determine the weight to be given to evidence. The court found that a defendant may adequately confront the breath test through the usual tools at his disposal, i.e., (1) relying on the state's burden of proof, (2) cross examination, and/or (3) presenting defense evidence. See also *Fuenning v Super. Ct. In & For Cty. of Maricopa,* 620 P.2d 121 (Ariz. 1983) wherein legislation was found to be rational, compelling, and necessary despite defense evidence of a $+10\%$ Intoxilyzer error, up to 30% partition ratio error, error based on the variable rate of absorption of alcohol in the bloodstream, and the fact that the breath test can only measure the amount of alcohol in the blood at the time of the test, not at the time of driving. Challenges to the accuracy of the test may be made on any relevant grounds.

California evidently uses a "rule of convenience" as to the partition ratio error, i.e., the defendant is presumed to have a 2100:1 partition ratio unless he presents evidence as to his personal partition ratio

**64**

which establishes that the presumed ratio is not valid for him/her. General evidence of such a possibility of error in the partition ratio will not suffice to rebut the presumption. The court found that application of the rule is not unduly burdensome to the defendant as he/she has the option of electing to eliminate this potential problem by taking a blood test. *People v Pritchard,* 209 Cal. Rptr. 314 (App. Dep't., Super. Ct. 1984). Florida also provides the option of a blood test. See § 316.1932(f)3 *Fla. Stat.* Certainly the defendant at any time can take a blood test to determine his/her partition ratio.

The Nebraska cases on which the defense relies all held that breath tests converted to blood alcohol content were admissible in evidence although they should be adjusted to reflect any margin of error found by the trial court. The courts recognized that, while the approved methods of testing and the presumption that such evidence is admissible is a legislative right, it is a judicial determination as to whether the evidence is sufficient to sustain a conviction if believed. The judicial determination is whether the evidence is sufficient to sustain a conviction. The court in dicta in *State v Gerber,* 291 N.W.2d 403 (Neb. 1980) suggested, due to error on breath test instruments, that said machines should be limited to a corroborative role in the prosecution. This Court fails to see the applicability of *McClain* to the issue at hand.

Three factors, i.e., body temperature, hematocrit, and breathing pattern, according to Dr. Hlastala, can affect a person's partition ratio. Breathing pattern could have the greatest effect. Breathing pattern can be observed by the test operator. Temperature variations produced with sickness are likely to be discovered through observation or questioning prior to the breath test. It is the up to four degree temperature variation that is likely to go undetected. A one degree variation could produce a 6.5% error (.0065 on a .10 reading). There is no way to determine a person's hematocrit absent specific blood testing. The hematocrit range variation could produce at most a 6% error (.006 on a .10 reading).

Dr. Hlastala admitted that in the vast majority of cases involving blood-breath correlations the partition ratio is 2100:1 or higher (86 to 90% of the population). A higher breath alcohol result than actual blood would occur in approximately 10 to 14% of the population. While Dr. Hlastala testified that the ratio was not based on scientific reliability but on empirical reliability, both Dr. Borkenstein and Dr. Rarick agreed that the 2100:1 ratio is acceptable as reliable in legal applications.

This Court is of the opinion that the testimony viewed in total shows

**65**

that potential interferants as indicated by the witnesses, excepting acetone, do not significantly affect breath tests conducted on infrared instruments. Acetone is not a factor in the instant cases since each involved instrument has an acetone screen. It would appear that other external toxic interferants if present in amounts to be measured would require emergency medical treatment. Dr. Borkenstein's testimony on this point was quite clear while Dr. Jensen's testimony involved possibilities without specific knowledge as to quantities to produce readings on infrared instruments.

This Court, based on the evidence in the instant case along with the rationale in the cited case authority, is of the opinion that the blood alcohol results produced from the Intoximeter 3000, Intoxilyzer 5000, and Intoxilyzer 4011AS pursuant to statutory authority, if complied with, is admissible in evidence. The weight of such evidence is for the fact finder.

The defense has, as it has in the past, sought to challenge the admissibility of breath test results based on general overall unreliability, i.e., it has challenged the overall approved methods or techniques rather than the weight of the breath test evidence in a particular case. This Court would suspect that this occurs due to the cost of expert witnesses in each individual case as compared with the consequences of conviction. While the above is recognized and appreciated, breath test evidence can be challenged by effective cross examination and by defense expert witnesses in the particular case.

The defense herein seeks to limit the testimony of state witnesses to the actual operation of the breath test instrument and results obtained at the time it measures the attenuation of light at the respective micron bands. The defense seeks to prevent testimony of a specific blood alcohol content. Based on the above and foregoing, if the state shows that the method or technique of breath testing is approved, that the instrument was in proper working order, its operator qualified, and the test properly administered, the blood alcohol content as determined by a breath test is admissible. This Court will not limit the state's testimony as requested. The reliability of said result can be challenged as indicated above not by limiting testing that is statutorily admissible.

Based on the above and foregoing, it is hereby:

ORDERED and ADJUDGED that Defendants' Motions in Limine are denied.

DONE and ORDERED in Chambers at Daytona Beach, Volusia County, Florida this 7th day of September, 1988.